

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 1:10mj215 |
| | ) | |
| JOSEPH GEORGE ECKER | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

This matter comes before the court pursuant to Defendant's Motion for Revocation of Detention Order. For reasons set forth below, the Motion is denied.

I.

Based on the de novo[1] hearing conducted in this matter on May 5, 2010, the Court finds the relevant facts to be as follows:

On April 7, 2010, the Defendant was arrested for knowingly and intentionally manufacturing, distributing or dispensed, or possessed with the intent to manufacture, distribute, or dispense, a controlled substance, a violation of code 21 U.S.C. § 841(a)(1). On April, 9, 2010, Magistrate Judge Anderson found the defendant to be a flight risk and danger to the community and therefore denied him bond in this case.

II.

In deciding whether or not a defendant poses a danger to the community, thus mandating

---

[1] De novo review is conducted pursuant to United States v. Williams, 753 F.2d 329, 333 (4th Cir. 1985).

his detention pending trial, the Court must consider the factors set forth in 18 U.S.C. § 3142 (g). These factors include:

(1) The nature and circumstance of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug. --

The Defendant has been arrested on a drug charged. This is a presumption case.

(2) The weight of the evidence against the accused. --

The governments evidence shows that a confidential informant Berger reported to Special Agent Lenhart, who met the defendant through a mutual friend, that Berger purchased 100 Methadone 40 mg wafers per month from Mills in approximately 2007. Mills revealed that Ecker was the source of those pills. When Mills was arrested for possession of narcotics, Ecker contacted Berger and told him that he would like to sell the narcotics directly to Berger. In September 2008, Berger began purchasing 100 Methadone 40 mg wafers from Ecker, at the price of $25 for each wafer. Berger continued to purchase the narcotics from Ecker until February 2009 when Berger was arrested and incarcerated. In May 2009, Berger resumed purchasing Methadone from Ecker in quantities of 400 to 600 Methadone 10 mg pills per month. Berger paid $4 for each 10 mg Methadone pill. Ecker was aware that the pills were being re-sold for profit. The drug transactions that the government alleges took place at Ecker's residence.

Berger engaged in three separate controlled purchases from the Defendant at his residence on March 2, March 15, and March 26, 2010. In the course of these three controlled purchases, Defendant distributed more than 2,000 Schedule II prescription narcotics in exchange for approximately $18,000.

These transactions were consensually monitored, and in one the Defendant can be heard talking about how many of the narcotics the $6,500 that Berger paid to Ecker covered, and

2

how much more Berger owed Ecker. The third controlled purchase on March 26, 2010, Defendant sold Berger 800 Methadone, 120 Opana, and 100 Dilaudid pills.

On April 5, 2010, a search warrant was issued to the Defendant's residence and on April 7, 2010, law enforcement officers executed the search warrant on his residence located in Middleburg, Virginia. The also discovered keys to a safety deposit box.

After executing the search warrant, based on bank statements recovered during the search, they executed a warrant on the Middleburg Bank, located at 111 West Washington Street, Middleburg, Virginia, 20117. They departed the Bank on April 7, 2010, Mrs. Ecker entered the back door of the Bank with two large empty bags. Law enforcement had notified the Bank that the contents of the safe deposit boxes were connected to Ecker's alleged illegal activities, and were in the process of applying for a search warrant. The Bank froze access to the safety deposit boxes for 24 hours.

The following morning the government obtained and executed a search warrant for the safe deposit boxes connected to the keys recovered at the Ecker residence. In the safe deposit boxes they found 49 bottles of Schedule II controlled substances, a 65 - pound silver bar, jewelry, coins, two U.S. passports, one Costa Rican passport belonging to Maria Ecker, and $8,000 cash. Also found were the pre-marked bills used in the three March 2010 undercover controlled buys. (Gvt Ex 2 -9).

This indicates that the governments evidence is very strong.

(3) The history and characteristics of the accused. --

Defendant is 55 years old, born in Bethesda, Maryland and has resided at the Middleburg, Virginia home for approximately 11 years. His home is on the market indicating he plans to move to Costa Rica. The Defendants parents live in Gaithersburg, Maryland and

3

he has brother in Maryland and sister living in Santa Rosa, California. He married Maria in 1994 and has no children. The government says it is investigating Mrs. Ecker.

Defendant has a serious medical condition for which he takes a number of prescription drugs. The defendant appeared in a wheel chair at his hearing. There is evidence that he has been able to walk by himself for short distances. The Court adopts the health section found in t the Pretrial Services Report on page 3.

There is also some indication that Dr. Mauroner has terminated his relationship with the defendant on April 9, 2010.

The Defendant has had a number of previous convictions. For example, September 30, 1982, a forgery or counterfeit conviction where the verdict was withheld and placed on 2 years supervised probation. April of 1983, possession of a forged prescription also, obtain controlled drug substance by fraud. May of 1983, obtain controlled drug substance by fraud and obtain controlled drug substance by false name. Also in December of 1983, his probation was revoked and he was convicted of possession of forged prescription. In October of 1985 he was convicted of forgery and possession of Schedule III substance. March of 1990 he was convicted of forgery - narcotics prescription, he was convicted in June of 1990 of controlled drug substance - possession not marijuana  In July of 1990, obtain a prescription by personation and a warrant was issued for violating his probation.

(4) The nature and seriousness of the danger posed to any person or the community that would be posed by the accused's release. --

The defendant has had numerous contacts with the law involving prescriptions and he poses a danger to the community.

The defendant also poses a flight risk in that he only has some community ties to his

4

parents, but he also has his ties to Costa Rico. He has used a number of different alias and has a number of different social security numbers.

The Defendant has countered, with the evidence that electronic monitoring would assure the defendants appearance at future hearings. Furthermore, the Defendant contends that the Defendant has not been able to receive his medications from the Alexandria Jail that have been prescribed for him.

The Court finds that electronic monitoring is not a suitable substitute considering the strength of evidence against the Defendant as well as his ability to flee. The Court will require the Alexandria Jail to provide the defendant with his proper prescriptions.

IV.

The Court finds that because of the nature of the charge against the Defendant, his history, that he poses a danger to the community and is a risk of flight. The Court further finds that no combination of conditions would insure the safety of the community and the Defendant's presence at future hearings.

Accordingly, the Motion for Revocation of Detention Order is DENIED.

/s/
James C. Cacheris
United States District Judge

Alexandria, Virginia
May __, 2010